The document below is hereby signed.

Dated: September 24, 2012.



_____

**S. Martin Teel, Jr.**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| STEPHEN THOMAS YELVERTON, | ) | Case No. 09-00414 |
| | ) | (Chapter 7) |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| STEPHEN THOMAS YELVERTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding No. |
| | ) | 12-10011 |
| ALEXANDRA N. SENYI DE | ) | |
| NAGY-UNYOM, | ) | Not for publication in |
| | ) | West's Bankruptcy Reporter |
| Defendant. | ) | |

<u>MEMORANDUM DECISION RE CROSS-MOTIONS FOR SUMMARY JUDGMENT</u>

This is an action filed by the debtor, Stephen Thomas
Yelverton, seeking a determination that all monetary obligations
owed to his former wife, Alexandra N. Senyi de Nagy-Unyom,
including those arising under a prenuptial agreement, are
dischargeable and thus discharged by his discharge under 11
U.S.C. § 727.  The parties have filed cross-motions for summary
judgment.

In his motion, Yelverton contends that because the
prenuptial agreement was not ratified, merged into, or
incorporated into the decree of divorce, the obligations arising
under that agreement are contractual obligations and not domestic
support or marital obligations excepted from discharge under 11
U.S.C. §§ 523(a)(5) and 523(a)(15).  In her motion, Senyi
contends that her claims against Yelverton are excepted from
discharge: (a) pursuant to 11 U.S.C. § 523(a)(2)(B) because Senyi
reasonably relied upon statements made by Yelverton, who was
acting in bad faith and with the intent to deceive, regarding his
intent to honor the obligations set forth in the prenuptial
agreement; (b) pursuant to 11 U.S.C. § 523(a)(6) because
Yelverton's allegedly false statements regarding his drafting of
the agreement to be enforceable and to ensure support of Senyi
were made with the intent to defraud Senyi; (c) pursuant to 11
U.S.C. § 523(a)(5) because the claims constitute domestic support
obligations; and (d) pursuant to 11 U.S.C. § 523(a)(15) because
they arise under a judgment of absolute divorce entered in the
Superior Court of the District of Columbia.[1]

For the reasons that follow, the court concludes that:

     1.  Senyi has met her burden to show that the $7,000

---

[1]  Senyi erroneously referred to 11 U.S.C. § 523(a)(11)
instead of § 523(a)(15), but the context makes clear that she
meant § 523(a)(15).  Yelverton's opposition to Senyi's
cross-motion for summary judgment views her as relying on
§ 523(a)(15), and so will I.

monthly marital support payments and the $17,000 monthly
alimony payments described in the prenuptial agreement and
referred to in the divorce decree are nondischargeable
obligations under § 523(a)(5) or § 523(a)(15), and will
grant summary judgment in Senyi's favor as to those portions
of her claim.

2.   As to Senyi's $140,000 claim for employment-related
income and the $26,000 claim for unpaid rental obligations
mentioned in the prenuptial agreement, Senyi has failed to
produce or point to any evidence adequate to support a
finding that these are nondischargeable obligations under
§ 523(a), and I will grant summary judgment in favor of
Yelverton as to these obligations.

3.   Finally, Senyi's claims include a postnuptial
document wherein Yelverton agreed to pay to her the first
$100,000 he receives out of the proceeds of the debtor's
interest in a family corporation owning a North Carolina pig
operation.  Senyi has not shown that this obligation, if a
monetary claim, is of a nondischargeable character, and I
will grant Yelverton summary judgment as to that obligation,
without prejudice to Senyi's later seeking a determination
of nondischargeability for any monetary claim awarded to
her, based on the postnuptial document, in remand
proceedings in the Superior Court under D.C. Code § 16-910.

3

4.   To the extent that remand proceedings in the Superior Court result in an award of property to Senyi that is effective against the bankruptcy estate, such an award will not constitute a claim for money and thus will not present an issue of dischargeability.   To the extent that, in lieu of Senyi actually obtaining property from Yelverton, the remand proceedings result in an award of a money claim against Yelverton, then at that juncture Senyi can seek a judgment declaring the debt to be nondischargeable under § 523(a)(15).

I

The following are the material facts as to which, at this juncture, there is no genuine dispute.

The parties signed a prenuptial agreement on September 29, 2006, in the presence of a Notary Public in Hamilton, Bermuda. The agreement provided, *inter alia*, that:

1.   Yelverton was to "provide $7,000 per month to [Senyi] during the marriage for her support and use;"

2.   Senyi was "entitled to a draw of $10,000 per month after December, 2006" in connection with her role as an employee of a partnership formed by Yelverton and Senyi ("Yelverton-Senyi"), with the details of Senyi's employment set forth in a separate employment contract dated March 1, 2007;

3.   Yelverton was to rent an apartment owned by Senyi and located in Paris as a business office for Yelverton-Senyi at a rental rate of 950 Euros per month for a term of three years so long as the business was in operation; and

4

> 4. "In the event of termination of the marriage
> . . . . [Yelverton] agrees to pay alimony of $17,000
> per month, so long as [Senyi] is single, plus child
> support. This amount may not be lowered by any court
> in order to protect [Senyi's] interests."

The parties were lawfully married on September 30, 2006, one day after executing the prenuptial agreement. The prenuptial agreement was drafted solely by Yelverton. Additionally, Yelverton solely drafted two Employment Contracts dated March 1, 2007 and March 1, 2008, which governed the terms of Senyi's employment with the Yelverton-Senyi partnership.

On April 2, 2008, Yelverton and Senyi executed a one-sentence document wherein Yelverton stated "I, Stephen Thomas Yelverton, agree to give my wife, Alexandra-Nicole Senyi de Nagy-Unyom, the first $100,000 in proceeds that I receive from the sale of my interest in my family's pig operation in North Carolina." Both parties have referred to this as a "promissory note." As proceedings in the main bankruptcy case have shown, Yelverton's interest in the pig operation was via the shares he held in Yelverton Farms, Ltd. The chapter 7 trustee in the main case has liquidated the debtor's shares in Yelverton Farms, Ltd. by way of a settlement with the other shareholders of that corporation. *See Memorandum Decision re Debtor's Motion to Vacate Order Approving Settlement*, Dkt. No. 506 in Case No. 09-00414 (*In re Yelveton*, —— B.R. --- (Bankr. D.D.C. Aug. 8, 2012)), as to which Yelverton has filed a notice of appeal.

The parties have been legally separated since April 15, 2008. Senyi filed for a dissolution of marriage on October 28, 2008; the parties filed an uncontested praecipe on October 28, 2008; and the hearing for an uncontested divorce took place on December 12, 2008, at which time Yelverton contested the divorce despite the uncontested praecipe and separation agreement.

Yelverton filed for relief under Chapter 11 of the Bankruptcy Code on May 14, 2009. In a December 30, 2009 order, this court lifted the automatic stay for the limited purpose of permitting the parties' divorce proceedings in Case No. 2008 DRB 003258 to go forward in the Superior Court. The court did not lift the stay to permit enforcement of a monetary judgment against the debtor. The case was converted to a case under Chapter 7 on August 20, 2010, and Yelverton received a Chapter 7 discharge on December 3, 2010.

Senyi's claims whose dischargeability is at issue include those she has asserted by a proof of claim in the bankruptcy case in order potentially to receive a distribution from the estate as a creditor. On September 1, 2009, Senyi filed a proof of claim in the amount of $649,600, and she filed an amended proof of claim on October 15, 2010, in the amount of $612,600. The amended proof of claim is based largely on obligations established by the parties' prenuptial agreement, and is comprised of the following monetary claims: (1) $329,000 in

6

spousal support based upon 47 months of non-payment of the $7,000
monthly support Yelverton was obligated to pay to Senyi during
the marriage; (2) $140,000 in salary based upon the $10,000
monthly compensation Senyi was entitled to receive pursuant to a
March 1, 2007 employment contract with the Yelverton Law Firm,
PLLC, which agreement is referenced in the prenuptial agreement;
(3) $26,000 based upon Yelverton's obligation to rent from Senyi
her apartment located in Paris; (4) alimony of $17,000 per month
as of October 2010;[2] and (5) $100,000 based upon the postnuptial
"promissory note" under which Senyi was to receive the first
$100,000 in proceeds from Yelverton's interest in the family
North Carolina pig operation.[3]  Yelverton's complaint seeks a
determination that those claims are of a dischargeable character.
The complaint, however, can be read as seeking a determination
that any monetary obligations owed to Senyi and arising out of

---

[2]  As of July 11, 2012, Senyi alleges that the outstanding
alimony due is $357,000.00 based upon 21 months of non-payment.

[3]  Yelverton has abstained from making payment to Senyi of
alimony, spousal support, or salary.  Taking accrued alimony into
account, Senyi asserts that her claim has grown to $952,600.00 as
of July 2012. In her original proof of claim, Senyi asserted also
a right to recover $250,000 based upon Yelverton's failure to
fully fund a $500,000 account in her favor before October 31,
2006.  In a ruling of August 11, 2010, addressing this and other
claims, the Superior Court rejected this claim on the grounds
that Yelverton had paid amounts to Senyi in excess of the
$500,000 and had thus fully satisfied this obligation.
Consistent with the Superior Court's ruling, Senyi's amended
proof of claim in this court abandoned the previously asserted
claim to recover on this basis.

7

their marital relationship and the ensuing divorce proceeding.
In remand proceedings in the Superior Court, discussed later, it
is possible that additional obligations will be imposed against
Yelverton and in favor of Senyi.

Yelverton placed the validity of the prenuptial agreement at
issue during the divorce proceeding, contending that it was
unconscionable, involuntary, the product of misrepresentation and
fraud.  He further argued that performance of the agreement was
either impractical or impossible.  On August 11, 2010, the
Superior Court of the District of Columbia entered *Findings of
Fact, Conclusions of Law, and Judgment of Absolute Divorce*,
rejecting Yelverton's argument.  The Superior Court held that
Yelverton "has not demonstrated that the Pre-Nuptial Agreement is
invalid, or should be considered unenforceable by the Court."
Dec. at 30.  The Superior Court further ruled that:

> the Court concludes that Defendant [Yelverton] is
> liable for $17,000.00 per month for alimony as per the
> Agreement, and is obligated to start alimony payments
> as of the date of this Order.  He is also liable for
> any arrearages on his obligation of $7,000 per month in
> marital support to Plaintiff [Senyi] to the extent that
> he has not made these monthly payments during the
> marriage including the time after the parties'
> separation up until the date of this Order.

Dec. at 33.  Its decision included a Judgment, which decreed
that:

> The Pre-Nuptial Agreement between the parties dated
> September 29, 2006 is valid concerning monthly income,
> spousal support, alimony and life insurance to the
> extent that it exists as listed in the bankruptcy

8

> proceedings however, the Court has no knowledge
> concerning the existence, his insurability or whether
> Plaintiff has an insurable interest.

The Judgment states that Yelverton is not entitled to a return of any funds from Senyi and did not award any alimony or support payments in his favor.

In an order dated February 13, 2012, the Superior Court rejected an attempt by Senyi to seek an order for contempt based on Yelverton's failure to pay support, and ruled as follows:

> Plaintiff Senyi requests this Court to adjudicate
> Defendant in contempt of court for not paying the alimony
> he is contracted to pay through their pre-nuptial
> agreement. The Judgment held that the pre-nuptial
> agreement was a valid and enforceable contract. It also
> held that pursuant to the terms of the contract,
> Defendant Yelverton promised to pay Plantiff $17,000 per
> month in alimony. This Court reminds Plaintiff that the
> pre-nuptial agreement was not merged or incorporated into
> the Judgment. As such, the alimony is not court-ordered
> alimony. While Defendant Yelverton may be liable to
> Plaintiff for breach of contract in his non-payment of
> alimony, this Court may not find him in contempt of any
> court order in his non-payment of alimony. As such, this
> Court denies Plaintiff's Motion to Reconsider.

In an order of December 11, 2011, the Superior Court treated the Judgment as final. Yelverton took an appeal contending that the Judgment was non-final because the Superior Court had failed to address an equitable distribution of property under D.C. Code § 16-910. On June 4, 2012, pursuant to a motion by Yelverton, the District of Columbia Court of Appeals remanded the matter to the Superior Court for further proceedings "consistent with the statements made in [Yelverton's] motion." Yelverton asserts that

9

the remand was for the purpose of making "a final determination

as to a comprehensive property settlement between the parties

under D.C. Code, Section 16-910 . . . ."[4]

II

A preliminary issue is whether the possibility that no final

judgment has been entered in the divorce proceeding makes it

inappropriate to address issues of dischargeability at this

juncture.  The remand to the Superior Court raises the

possibility that the Superior Court will impose additional

obligations (or alter obligations) as between Yelverton and Senyi

incident to their divorce.  Even if the remand renders the

divorce decree "interlocutory,"  Senyi has a present-day right to

payments under the agreement, making the issue of

dischargeability ripe for this court's consideration.  See

*Nicolae v. Mirea (In re Mirea)*, 2012 WL 3042239, at * 7 (Bankr.

E.D. Va. July 25, 2012) (observing that § 101(14)(A)'s definition

of a domestic support obligation makes no distinction between

interim and final orders, and finding that courts can permissibly

---

[4]  Senyi has countered Yelverton's assertion with a
declaration that the divorce decree was a final order, which
Yelverton failed timely to appeal.  Senyi has not offered any
evidence to contradict the fact that some aspect of the case was
remanded to the Superior Court.  Although the record in this
adversary proceeding is incomplete with respect to the scope and
subject matter of the remand, there was a remand, and it follows
that the Court of Appeals may have agreed with Yelverton that
there was not yet an appealable final order.  I will assume in
Yelverton's favor (without deciding the issue) that the divorce
decree was not a final appealable order.

10

rule on whether an obligation arising under an interim order is

nondischargeable under § 523(a)(5)).

III

A party is entitled to summary judgment when there is no

"genuine issue of material fact" and the undisputed facts warrant

judgment for the moving party as a matter of law.  Fed. R. Civ.

P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

When deciding a motion for summary judgment, "the court must view

the evidence in the light most favorable to the party against

whom summary judgment is sought and must draw all reasonable

inference in [the moving party's] favor." *Matsushita Elec.

Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party has the initial burden of demonstrating the

absence of a disputed issue of material fact. *Celotex v.

Catrett,* 477 U.S. 317, 323 (1986).  Once such a showing has been

made, the non-moving party must either (1) cite to particular

materials in the record showing that a fact is genuinely

disputed, or (2) "show[ ] that the materials cited do not

establish the absence . . . of a genuine dispute, or that an

adverse party cannot produce admissible evidence to support the

fact." Fed. R. Civ. P. 56(c)(1).  The party opposing summary

judgment "may not rely on conclusory allegations or

unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 104,

114 (2d Cir. 1998).  Moreover, not every disputed factual issue

is material in light of the substantive law that governs the

case.  "Only disputes over facts that might affect the outcome of

the suit under the governing law will properly preclude summary

judgment." *Anderson*, 477 U.S. at 248.

IV

The standard of proof under § 523(a)(5) and § 523(a)(15) is

a preponderance of the evidence, and the burden of proof rests on

the party who asserts that the debt is nondischargeable.  *See In*

*re Phegley*, 443 B.R. 154, 158 (B.A.P. 8th Cir. 2011); *In re*

*Erlich*, 384 B.R. 123, 128 (Bankr. W.D. Pa. 2008).[5]  Thus, Senyi

bears the burden of proof to show, by a preponderance of the

evidence, that her claim against Yelverton is nondischargeable.

---

[5]  To protect non-debtor divorcing spouses who agree to
reduced alimony and support in exchange for increased property
settlements, the Bankruptcy Reform Act of 1994 added the
additional protection of § 523(a)(15). *See In re Moeder*, 220
B.R. 52, 54 (B.A.P. 8th Cir. 1998). *See also* Sommer & McGarity,
Collier Family Law and the Bankruptcy Code, ¶ 6.07A (Matthew
Bender 2012) (discussing the legislative history of
§ 523(a)(15)).  Prior to the amendment of § 523(a)(15) by the
Bankruptcy Abuse Prevention and Consumer Protection Act of 2005
(BAPCPA), Pub. L. No. 109-8, 119 Stat. 23, the exception to
discharge of a debt of a kind described in § 523(a)(15) was
inapplicable if certain equitable considerations weighed in favor
of the debtor.  Decisions placed the initial burden on the
creditor to show that the debt was a debt of the kind described
in § 523(a)(15), with the burden then shifting to the debtor to
show that the equities weighed in his favor.  The balancing
defense having been eliminated from the statute, the burden of
proof rests where it begins: with the creditor seeking a
declaration of nondischargeability.

A.

Yelverton's principal argument is that the marital support and alimony obligations under the prenuptial agreement were not merged or incorporated into the divorce judgment, and thus do not fit within either § 523(a)(5) or § 523(a)(15).  When an agreement is not merged, ratified or incorporated into a divorce decree, it is governed by ordinary contract law, and the Family Division of the Superior Court lacks ongoing authority to enforce the agreement.  *See Cox v. Cox*, 707 A.2d 1297, 1300 (D.C. 1998); *Nolan v. Nolan*, 568 A.2d 479, 483 (D.C. 1990) (when an agreement is not merged into the divorce decree, even when a subsequent dispute arises in a domestic relations context, ordinary principles of contract law will govern); *Clark v. Clark*, 535 A.2d 872, 876 (D.C. 1987) (separation agreement that is not merged into divorce decree is governed by contract law);  *Borley v. Smith*, 233 P.3d 102, 109 (Idaho 2010) (when pre-existing agreement is not merged or incorporated into a divorce decree, it does not become an "operative part" of the divorce decree, leaving the divorce court without jurisdiction to modify the terms of the agreement).  That the agreement can only be enforced or modified in accordance with ordinary contract law rather than through enforcement of the divorce decree itself says very little about the character of the obligations arising under the agreement for purposes of §§ 523(a)(5) and (a)(15).

13

Section 523(a)(5) provides that a discharge under § 727 does not discharge any debt "for a domestic support obligation."  In turn, as relevant here, 11 U.S.C. 101(14A) defines "domestic support obligation" to mean any debt, regardless of when it accrues, that is--

> (A) owed to or recoverable by--
>     (i) a spouse [or] former spouse . . .
> (B) in the nature of alimony, maintenance, or support . . . of such spouse, [or] former spouse . . . without regard to whether such debt is expressly so designated;
> (C) established or subject to establishment before, on, or after the date of the order for relief  in a case under this title, by reason of applicable provisions of--
>     (i) a separation agreement, divorce decree, or property settlement agreement; [or]
>     (ii) an order of a court of record . . . ; and
> (D) not assigned to a nongovernmental entity . . . .

Senyi has made no assignment of her claims.  Accordingly, any debt owed Senyi is nondischargeable under § 523(a)(5) if it is:

- in the nature of alimony, maintenance, or support (without regard to whether such debt is expressly so designated); and

- established by (or subject to establishment by) a separation agreement, divorce decree, or property settlement agreement, or an order of a court of record.

Section § 523(a)(15) provides, in relevant part that a discharge under § 727 does not discharge any debt--

> to a spouse [or] former spouse . . .  and not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection

14

with a separation agreement, divorce decree or other
order of a court of record . . . .

Accordingly, even if a debt owed Senyi is not a domestic support
obligation, the debt is nondischargeable under § 523(a)(15) if
the debt has been or is incurred by Yelverton in the course of
his divorce or separation from Senyi, in connection with a
separation agreement, or in connection with a divorce decree or
other order of a court of record.

The language of §§ 523(a)(5) and 523(a)(15) does not suggest
that incorporation or merger into a divorce decree is a
prerequisite for finding nondischargeability under those
provisions.  In Yelverton's favor, it must be acknowledged that
courts often refer to the incorporation or merger of a
preexisting agreement into a divorce decree when discussing the
applicability of 11 U.S.C. § 523(a)(5) and § 523(a)(15).  *See
e.g., In re Hall*, 285 B.R. 485, 489 (Bankr. D. Kan. 2002); *In re
Short*, 232 F.3d 1018, 1023 (9th Cir. 2000); *In re Ginzl*, 430 B.R.
702 (Bankr. M.D. Fla. 2010); *In re Delos*, 2009 WL 4052151, *3
(Bankr. D.R.I. Nov. 19, 2009) (concluding that a loan incurred
incident to a premarital agreement, which was incorporated but
not merged with a final judgment of divorce, was "incurred by the
debtor . . . in the course of a divorce . . . in connection with
a divorce decree . . ." such that the claim was excepted from
discharge).  Nevertheless, while this reflects that some
obligations arising under agreements that *are* merged or

15

incorporated *are* nondischargeable obligations under 11 U.S.C.
§ 523(a)(5) or § 523(a)(15), these cases do not stand for the
inverse proposition that debts arising under an agreement that is
not merged or incorporated are not nondischargeable under those
provisions.  That the agreement itself was not incorporated or
merged into the divorce decree does not change the fact that some
of the underlying obligations constitute domestic support
obligations and obligations that were incurred by Yelverton in
the course of his divorce from his non-debtor spouse, Senyi.  *See*
*Paynton v. Paynton*, 914 S.W.2d 63, 65 (Mo. App. E.D. 1996)
("There are three types of maintenance: (1) decretal maintenance
ordered by the court; (2) contractual maintenance, created by the
parties, but not incorporated into the decree; and (3) separation
agreement decretal maintenance, agreed to by the parties and
incorporated into the decree.  The primary difference between the
three is the remedies available for enforcing the judgment.")
(internal citation omitted) (quoted in *Lueckenotte v.*
*Lueckenotte*, 2000 WL 817729 (Mo. App. W.D. June 27, 2000)
(unpublished).

Because this is a chapter 7 case, not a chapter 13 case,
Senyi can prevail whether the debt fits under § 523(a)(5) or,

16

instead, § 523(a)(15).[6]  For dischargeability purposes, it is
unnecessary to decide which of the two provisions applies so long
as the court can find that one or the other applies.[7]  In chapter
7, both categories of debt are, without exception,
nondischargeable, making it generally unnecessary to distinguish
between the two.  *See In re Golio*, 393 B.R. 56 (Bankr. E.D.N.Y.
2008) (discussing how the 2005 BAPCPA amendments eliminated a
balancing test in § 523(a)(15) that allowed a chapter 7 debtor to
show that a debt of the kind described in § 523(a)(15) was
dischargeable if the debtor lacked the ability to pay or if the
benefit to the debtor of discharging the debt outweighed the
detrimental consequence to the spouse, former spouse, or child of
the debtor).

When deciding whether a debt constitutes a domestic support
obligation or, instead, only a property settlement, courts look

---

[6]  Section 523(a)(15) does not apply in chapter 13 cases,
and thus the distinction between marital support obligations
covered by § 523(a)(5) and debts incurred during a divorce other
than such support obligations remains significant for chapter 13
debtors, as it did for dischargeability purposes in chapter 7
cases filed prior to the effective date of § 523(a)(15).  *See* 11
U.S.C. § 1328(a)(2) (providing that debts of the kind specified
in § 523(a)(5) are nondischargeable in chapter 13 whereas debts
of the kind specified in § 523(a)(15) are subject to discharge).

[7]  Prior to the BAPCPA amendment of § 523(a)(15), the
distinction between § 523(a)(5) and § 523(a)(15) was significant
in chapter 7 cases because the debtor could defend against the
nondischargeability of a § 523(a)(15) obligation pursuant to a
balancing test set forth in § 523(a)(15), whereas all § 523(a)(5)
obligations were, without exception, nondischargeable.

to the function the award was intended to serve. *See, e.g., In re Phegley*, 443 B.R. 154, 157 (B.A.P. 8th Cir. 2011). Although not binding on the bankruptcy court, a divorce decree's characterization of the award is a useful starting point for the bankruptcy court's analysis. *Id.* at 158. Factors considered include "[t]he language and substance of the agreement in the context of surrounding circumstances, using extrinsic evidence if necessary; the relative financial conditions of the parties at the time of the divorce; the respective employment histories and prospects for financial support; the fact that one party or another receives the marital property; the periodic nature of the payments; and whether it would be difficult for the former spouse and children to subsist without the payments." *Id.*

In *Richardson v. Edwards*, 127 F.3d 97 (D.C. Cir. 1997), decided prior to the enactment of § 523(a)(15) and under a different version of § 523(a)(5), the court of appeals addressed the issue of whether an obligation not designated as alimony, maintenance, or support was dischargeable. It held that the parties' contract was plain and unequivocal in casting the debtor's obligation to make mortgage payments on his spouse's residence as not alimony, maintenance, or support, and that this controlled whether the agreement was one for alimony, maintenance, or support even though the spouse was financially in need of the debtor making those payments.

Under BAPCPA, however, § 523(a)(5), in conjunction with
§ 101(14A), now makes nondischargeable any debt to a spouse
imposed by a separation agreement that is "**in the nature of**
alimony, maintenance, or support . . . of such spouse
. . . **without regard to whether such debt is expressly so
designated**" (emphasis added).  Accordingly, by commanding the
court to focus on the nature of the obligation, and to disregard
whether it was expressly designated as alimony, maintenance, or
support, BAPCPA's amendments abrogated the *Richardson v. Edwards*
approach, and permit consideration of whether an obligation cast
by the parties as a property settlement is "in the nature of
alimony, maintenance, or support."   In other words, although the
parties' obligations arise under state law, § 523(a)(5), in
conjunction with § 101(14A), now presents a Federal question, not
a state law question, of whether any such obligation, in
substance, is in the nature of alimony, maintenance, or support
despite the parties' or state court's labeling of the obligation.
*See In re Langman*, 465 B.R. 395, 404 (Bankr. D.N.J. 2012); *In re
Kloeppner*, 460 B.R. 759, 761 (Bankr. D. Minn. 2011) ("[T]he Court
must look to the substance of the state court's award to Bartos,

not solely the label of that award.").[8]

In any event, in contrast to the facts presented in *Richardson v. Edwards*, part of Yelverton's obligations under the prenuptial agreement *were* specifically designated as marital support or alimony, and nothing Yelverton has presented shows that the obligations, in substance, were not in the nature of marital support or alimony.  It follows that § 523(a)(5) applies to these obligations.  As discussed later, however, Senyi has not shown that the other obligations set forth in the prenuptial agreement, or in the postnuptial document regarding Yelverton's interest in the North Carolina pig operation, were in the nature of alimony, maintenance, or support, and thus those obligations do not fit within § 523(a)(5).

Again, however, this inquiry into § 523(a)(5) assumes the necessity of distinguishing between domestic support obligations, on the one hand, and property settlements between divorcing spouses, on the other.  Whether Senyi's claims against Yelverton

---

[8]  *See also United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 727 (1985) (addressing analogous question of what rights under state law result in a taxpayer having "property" under the federal tax lien statute, 26 U.S.C. § 6321: the classification question is a matter of federal law applied to rights created by state law); *United States v. Craft*, 535 U.S. 274, 278 (2002) (same); *Drye v. United States*, 528 U.S. 49, 58 (1999) (same); *In re Guardian Realty Grp., L.L.C.*, 205 B.R. 1, 4 (Bankr. D.D.C. 1997) (federal law controls what rights of the debtor under state law were "property" of the debtor for purposes of 11 U.S.C. § 541); *In re Wyatt*, 440 B.R. 204, 213-14 (Bankr. D.D.C. 2010) (federal law controlled whether payments to car lienor were "proceeds" of car under § 541(a)(6)).

arising under the prenuptial agreement are domestic support obligations or are, instead, in the nature of a property settlement, is a purely academic issue because both categories of obligation are nondischargeable in a chapter 7 case commenced after the effective date of BAPCPA. *See* 11 U.S.C. § 523(a)(5) and § (a)(15).

Yelverton would have this court treat all of the obligations arising under the prenuptial agreement as relating to a private contract that does not give rise to any domestic support obligations and is unrelated to his divorce. His position is unfounded.

The marital support and alimony obligations easily fit within the definition of a "domestic support obligation" under § 101(14A). There is no dispute that the obligations are owed to Senyi as a spouse or former spouse, so § 101(14A)(A) is satisifed. Nor is there any contention that the obligations have been assigned, so § 101(14A)(D) is satisfied. The record demonstrates that § 101(14A) paragraphs (B) and (C) have also been satisfied. As to § 101(14A)(B), the parties' prenuptial agreement created marital support and alimony obligations that were "in the nature of alimony, maintenance, or support" within the meaning of § 101(14A)(B). As to § 101(14A)(C), it may be necessary to distinguish between obligations that came due after versus before the parties separated:

(1) With respect to the first category (the marital support and alimony owed for months *before* the parties separated) the prenuptial agreement acted, within the meaning of § 101(14A)(C), as a "separation agreement" that "established" the obligations that were owed for the months after Yelverton and Senyi separated and proceeded to a divorce.[9]  Alternatively, within the meaning of § 101(14A)(C), those obligations were "subject to establishment" and later "established . . . by reason of applicable provisions of . . . an order of a court of record," namely, the Superior Court's Judgment that decreed that the obligations were a binding contractual obligation.

(2) As to the second category, the marital support owed for months *before* the parties separated, the amounts owed were arguably not established by the prenuptial agreement in its character of serving as a separation agreement, as the obligations were owed even without the parties separating. Nevertheless, within the meaning of § 101(14A)(C), the marital support obligation for those months was "subject to

---

[9]  In her motion, Senyi refers to a separation agreement between the parties.  Regardless of whether the parties also entered into a postnuptial separation agreement, the fact remains that the prenuptial agreement includes mutually agreed upon terms, not superceded by the postnuptial agreement, that were to govern in the event of a divorce.  As such, the prenuptial agreement constitutes a separation agreement for purposes of § 101(14A)(C)(i).

establishment . . . by reason of applicable provisions of .
. . . an order of a court of record," and, indeed, *was*
"established" by the Superior Court's Judgment holding that
it is an enforceable contractual obligation.

Yelverton's marital support and alimony obligations under the
agreement need not have been merged or incorporated into the
divorce judgment in order for the obligations to be
nondischargeable § 523(a)(5) domestic support obligations.  It
sufficed that they were either established by the prenuptial
agreement in its character of serving as a separation agreement
or were subject to establishment by a court order (or established
by a court order).

The Superior Court's divorce decree discussed at length the
validity of the martial support obligations and alimony payments
provided for under the prenuptial agreement.  Likewise, it relied
upon the prenuptial agreement's provisions relating to monthly
support and alimony in evaluating the respective rights of the
parties; it tailored the marital relief awarded under the
judgment to be consistent with those terms; and it expressly
decreed that "[t]he Pre-Nuptial Agreement between the parties
dated September 29, 2006 is valid concerning monthly income,
spousal support, alimony and life insurance to the extent that it

exists as listed in the bankruptcy proceedings . . . ."[10]

Likewise, the Superior Court concluded that:

> [Yelverton] is liable for $17,000.00 per month for
> alimony as per the Agreement, **and is obligated to start**
> **alimony payments as of the date of this Order**. He is
> also liable for any arrearages on his obligation of
> $7,000 per month in marital support to [Senyi] to the
> extent that he has not made these monthly payments during
> the marriage including the time after the parties'
> separation up until the date of this Order.

Mem. at 33 (emphasis added).

Although the monthly support obligations and alimony
payments arise, in the first instance, under a private agreement,
and this court is not bound by the parties' or the Superior
Court's labeling of the monthly payments as support and alimony,
the fact remains that the agreement and its terms were an
integral part of the Superior Court's findings upon which the
divorce decree was based. Although the Superior Court lacks the
authority to enforce or modify the monthly payment obligations
that arise under the agreement given that the agreement was not
merged or incorporated into the divorce decree, those obligations
are on their face support obligations, and Yelverton has not
presented evidence to show they are not support obligations.

---

[10]   The Superior Court found that the prenuptial agreement
controlled who was to get alimony. It noted that "if the Pre-
Nuptial Agreement was not in effect, the Court would consider
payment of some income to [Yelverton] by [Senyi] for a certain
time." Dec. at 16. Instead, Senyi was entitled to enforce the
deal she had obtained in the prenuptial agreement that she, not
Yelverton, was to get alimony.

In any event, even if the marital support and alimony obligations were *not* domestic support obligations under § 523(a)(5) and § 101(14A), these obligations would be, within the meaning of § 523(a)(15), debts incurred by Yelverton "in the course of a divorce or separation or in connection with a separation agreement, [or] divorce decree . . . ."

Accordingly, the court finds that the monthly marital support obligation of $7,000 and the monthly alimony payment of $17,000 that Yelverton is contractually obligated to pay under the prenuptial agreement are, as a matter of law, either domestic support obligations within the meaning of § 523(a)(5), or, alternatively, obligations incurred by Yelverton in the course of his divorce from Senyi within the meaning of 11 U.S.C. § 523(a)(15).

### B.

As for the claim in the amount of $140,000 based upon an employment agreement and the claim for $26,000 based upon a rental agreement embodied in the prenuptial agreement, Senyi has failed to offer evidence sufficient to support a finding that these obligations constitute § 523(a)(5) domestic support obligations as there is no evidence that they were "in the nature of alimony, maintenance, or support." She has also failed to show, alternatively, that these obligations fit within § 523(a)(15).

Although the $10,000 monthly salary payment was referred to in the prenuptial agreement, Yelverton was not personally liable to Senyi to make that payment.  Rather, the underlying obligation arises under a separate employment agreement between Senyi and a non-debtor entity, the Yelverton Law Firm.

Likewise, Senyi has failed to adduce evidence that would support a finding that the $26,000 rental obligation was incurred by Yelverton "in the course of a divorce or separation or in connection with a separation agreement, [or] divorce decree" within the meaning of § 523(a)(15).  Rather, the obligation was in the nature of a business agreement between the parties, independent of issues of separation or divorce or a property settlement.  Although it was contained within the prenuptial agreement, that agreement served dual purposes, serving both as a separation agreement (addressing what obligations Yelverton would have upon a separation and divorce) as well as issues relating to the parties engaging in business activities, including placing Yelverton into a landlord-tenant relationship with Senyi incident

to those business activities.[11]  With respect to the Paris
apartment, the prenuptial agreement only obligated Yelverton to
agree to lease the apartment, which he did.  The agreement
created only a leasehold relationship.  Whatever Yelverton owes
Senyi with respect to the Paris apartment is owed her as his
landlord under that lease, not by reason of her being his spouse,
and is not owed by Yelverton as an obligor under a separation
agreement.  Given that the lease arrangement retained its
separate landlord-tenant character and was not merged into the
divorce decree, the court will treat it as a conventional
business contract that gives rise to a conventional unsecured
obligation that is fully dischargeable in Yelverton's bankruptcy
case.

C.

As to the document in which Yelverton promised to pay to
Senyi the first $100,000 he receives from the proceeds of his
interest in the North Carolina pig operation, Senyi has not shown
that this obligation was for purposes of alimony, maintenance, or

---

[11]   The prenuptial agreement provided in relevant part:

Stephen agrees to rent an apartment owned by Alexandra
that is located in Paris, France, which will be used as
a business office for Yelverton-Senyi. The rent to be
paid to Alexandra shall be at least 950 Euros per month
and the lease term shall be for three years, so long as
the business is operating.

Prenuptial Agreement at 3.

support.  For all we know, it was a commitment to devote that
$100,000 towards payment of the amounts he owed Senyi for marital
support and alimony, and not intended to duplicate any of those
amounts.  The parties' papers are devoid of any explanation for
why Yelverton executed this document.  The burden of proof is on
Senyi.  She has failed to show that the document created an
obligation in the nature of alimony, maintenance, or support,
and, accordingly, the obligation is not nondischargeable under
§ 523(a)(5).  Nor has she shown that the obligation was incurred
in the course of a separation or divorce, or in connection with a
separation agreement, divorce decree or other order of a court of
record.  Accordingly, the obligation is not nondischargeable
under § 523(a)(15).  Nevertheless, if the Superior Court were to
rule in § 16-910 proceedings that Senyi is entitled to a monetary
claim for that $100,000 obligation as part of the equitable
distribution of property under § 16-910, such a claim would be
nondischargeable for reasons next discussed.

V

Yelverton's complaint seeks not merely a determination that
the claim asserted in Senyi's proof of claim is dischargeable,
but an even broader determination that *all* prepetition debts owed
by him to Senyi are dischargeable.  That he seeks this broader
determination is significant for the limited reason that the
equitable distribution proceeding under D.C. Code § 16-910

currently pending before the Superior Court could, potentially, give rise to an additional claim in favor of Senyi against Yelverton. If the decree were to include a monetary award in favor of Senyi, that would constitute an unsecured claim that would necessarily constitute a debt "incurred by the debtor in the course of a divorce or separation" such that it would be nondischargeable under § 523(a)(15). See *Johnson v. Fisher (In re Fisher)*, 67 B.R. 666 (Bankr. D. Colo. 1986) (lifting stay to permit divorce court to make equitable distribution determination that, to the extent it involves property of the estate, could only be asserted by the non-debtor spouse as an unsecured claim against the estate).[12] On the other hand, if an award of property to Senyi under § 16-910 had the effect that the property was her property as of the commencement of the divorce proceeding, and the bankruptcy trustee could not avoid the transfer under one of his avoidance powers, that would not give rise to a monetary claim against the estate. Instead, such a decree would altogether remove the property in question from the

---

[12]   It is unclear whether District of Columbia law would permit a § 16-910 decree to have such retroactive effect. *See Memorandum Decision re Debtor's Motion to Vacate Order Approving Settlement*, Dkt. No. 506 in Case No. 09-00414 (*In re Yelveton*, ——- B.R. --- (Bankr. D.D.C. Aug. 8, 2012)). If a § 16-910 equitable distribution decree can vest property in Senyi that was Yelverton's only upon the entry of the § 16-910 equitable distribution decree, the § 16-910 decree would be ineffective to divest the bankruptcy estate of any property of Yelverton that had become property of the bankruptcy estate. Senyi would be left with a monetary claim for the value of the property.

bankruptcy estate.   Either way, Yelverton would not be entitled
to a determination that the rights or benefits conferred upon
Senyi under such an equitable distribution decree are
dischargeable in Yelverton's bankruptcy case.   Nevertheless,
until the Superior Court issues its § 16-910 decree, it is
premature to decide the issue.   If the decree results in a
monetary award, Senyi can seek a determination of
nondischargeability then.

                                VI

     Senyi's motion asserts additional bases for
nondischargeability under § 523(a).   First, Senyi contends that
her claims against Yelverton are excepted from discharge under 11
U.S.C. § 523(a)(2)(B) because Senyi reasonably relied upon
statements made by Yelverton, who was acting in bad faith and
with the intent to deceive, regarding his intent to honor the
obligations set forth in the prenuptial agreement.   Senyi has
appended to her motion several post-petition emails, as well as
the debtor's plan of reorganization and related disclosure
statement (filed by the debtor before his case was converted from
chapter 11 to a case under chapter 7) in which Yelverton
expressed his intent to comply with the terms of the prenuptial
agreement.   Senyi has failed to submit evidence to support a
finding that any of these statements induced Senyi to extend
credit to Yelverton or otherwise alter, to her disadvantage, her

                                30

position as a creditor in this court or in the Superior Court.
Accordingly, the court will deny Senyi's motion for summary
judgment to the extent it relies on 11 U.S.C. § 523(a)(2)(B) as a
basis for nondischargeability and will grant summary judgment in
favor of Yelverton on this issue.

Next, Senyi contends that her claims are nondischargeable
under 11 U.S.C. § 523(a)(6) because Yelverton made false
statements regarding his drafting of the prenuptial agreement to
be enforceable and to ensure support of Senyi, and those
statements were made with the intent to defraud Senyi.  In
support of this position, Senyi points to two findings made by
the Superior Court in its Judgment of Absolute Divorce.  First,
that "[Yelverton], a lawyer and businessman, drafted the Pre-
Nuptial Agreement which he advised [Senyi] was judgment proof."
And second, that "[a]ll communications between Plaintiff and
Defendant indicate that it was the intent of Defendant Yelverton
to ensure that Plaintiff was cared for during and after the
marriage and advised her that he had drafted a contract that
would be upheld in the District of Columbia."  On the current
record, no reasonable finder of fact could conclude that
Yelverton entered into the prenuptial agreement with the intent
to defraud Senyi.  The Superior Court having ruled that, despite
the fact that almost all of the terms of the agreement were for
the benefit of Senyi, the agreement was nevertheless valid and

31

enforceable, and this court having now ruled that some of the core obligations arising under the agreement constitute nondischargeable domestic support obligations or nondischargeable obligations incurred in the course of a divorce, it would appear that Yelverton, true to his word, successfully drafted an enforceable agreement to which Yelverton is bound.  That Yelverton, with the benefit of hindsight and under drastically different financial circumstances, now seeks to discharge his obligations under the prenuptial agreement does little to inform the question of his intentions when entering into the agreement, which is the relevant inquiry for purposes of 11 U.S.C. § 523(a)(6).  Accordingly, the court will deny Senyi's motion for summary judgment to the extent it relies on 11 U.S.C. § 523(a)(6) as a basis for nondischargeability and will grant summary judgment in favor of Yelverton on this issue.

VII

A judgment follows.

[Signed and dated above.]

Copies to: All counsel of record.